Filed 5/25/23  P. v. Paulson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>LANCE ALLAN PAULSON,<br><br>        Defendant and Appellant. | A163471<br><br>(Contra Costa County<br>Super. Ct. No. 05-181374-0) |

Defendant Lance Allan Paulson appeals his conviction for first degree murder, asserting the trial court improperly instructed the jury with a modified flight instruction.  We disagree and affirm the judgment.

**I.**

**BACKGROUND**

*A.  Factual Background*

Defendant and the victim, Steve Gagnon, were longtime friends who saw each other on a regular basis.  On April 2, 2017, defendant and Gagnon planned to meet at Gagnon's house to watch a television show.  Gagnon invited defendant to arrive around 6:00 p.m.

The following day, Gagnon did not report to work, and his supervisor was unable to reach him.  Another supervisor went to Gagnon's house to check on him.  After arriving at Gagnon's home, the supervisor either knocked on the door or rang the bell.  Defendant answered the door.  The

1

supervisor observed defendant looked like "someone who had been in a fight or beat up" because his teeth appeared to be knocked out, one eye was bulging and black and blue, there was a cut on his head, and there was "blood splatter" on his shirt. The supervisor asked defendant if he was okay, to which he responded affirmatively.

The supervisor then asked if Gagnon was home. Defendant stated Gagnon was sleeping. The supervisor asked if he could come in and wake up Gagnon. Defendant allowed the supervisor to enter and indicated toward the bedroom where Gagnon's body was located. After observing Gagnon lying on his stomach in blood, the supervisor left the house and called 911.

Several officers arrived and one took defendant into custody. Detective Corporal Brian Elder observed defendant's black eye, an injury under defendant's chin that appeared consistent with a gunshot, injuries to the top of defendant's forehead at the hairline, and injuries to his mouth that made speech difficult. Inside the house, blood was present in numerous areas, including the bathroom floor, a Swiffer mop in the closet, the handle of a sliding glass door, bedroom walls, the bed in the master bedroom, and the kitchen sink and floor. Gagnon was observed lying on the floor in a pool of blood. There were no drag marks or other evidence indicating Gagnon had been moved to the location where he was found.

The police also located a Colt 1911, .45-caliber, semiautomatic pistol with blood on it and three rounds in the magazine. A shell casing was also stuck in the gun's chamber, which a firearms expert explained could occur if something prevented the gun from fully cycling and ejecting the cartridge case, such as the user did not hold the gun firmly enough or held it at an awkward angle when firing. Two empty .45-caliber shell casings were located in the hallway and one in the bedroom near Gagnon. Three corresponding

2

bullet holes were located in the bedroom wall across from the hall. The firearms expert determined the casings were all from the Colt pistol. The pistol's serial number matched that of a pistol owned by defendant's stepfather.

Police also located a bullet hole in the living room window near the front door, along with blood on the living room floor, living room couch, wall above the couch, and a hat on the corner of the couch. A crime scene analyst testified the bullet hole and blood spatter on the wall were consistent with defendant shooting himself. A forensic pathologist testified a bullet being fired through someone's head could cause a black eye, and a bullet entering under the chin in the middle of the head would likely cause two black eyes.

## B. Procedural Background

The Contra Costa County District Attorney charged defendant with first degree murder. (Pen. Code, § 187, subd. (a).) The information further alleged personal discharge of a firearm causing great bodily injury or death. (*Id.*, § 12022.53, subd. (d).)

During trial, the prosecution requested the court provide an instruction entitled "Consciousness of Guilt." That instruction stated: "If the defendant attempted to kill himself after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude the defendant attempted to kill himself, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant attempted to kill himself cannot prove guilt by itself." Defendant objected to the proposed instruction, asserting the record did not support a finding that he attempted suicide or that any such attempt was made to avoid arrest or prosecution. The trial court overruled defendant's objection, noting, "Courts have long held any conduct of a defendant subsequent to the commission of the crime tending to

3

show consciousness of guilt is relevant and admissible."  It explained "there has been some evidence that if believed by the jury could have them find that the defendant's attempted suicide was evidence of his consciousness of guilt."  The court subsequently gave the requested instruction.

The jury found defendant guilty of first degree murder and found true the firearm enhancement.  The trial court sentenced defendant to consecutive prison terms of 25 years to life for murder, and 25 years to life for the firearm enhancement.  Defendant timely appealed.

## II.

## DISCUSSION

On appeal, defendant argues the trial court improperly gave an instruction entitled, "Consciousness of Guilt."[1]  He contends the instruction was improper because there was no evidence defendant attempted suicide in an effort to evade or hinder prosecution.

### A.  CALCRIM No. 372

The court has a sua sponte duty to instruct on flight whenever the prosecution relies on evidence of flight to show consciousness of guilt.  (Pen. Code, § 1127c; *People v. Abilez* (2007) 41 Cal.4th 472, 521–522.)  " ' " '[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.]  Flight manifestly does require, however, a purpose to

---

[1] The instruction at issue was designated CALCRIM No. 371, entitled "Consciousness of Guilt."  However, we refer to it as CALCRIM No. 372 because the instruction is actually a modified version of CALCRIM No. 372, entitled "Defendant's Flight."  The model CALCRIM No. 372 states:  "If the defendant fled [or tried to flee] (immediately after the crime was committed/ [or] after (he/she) was accused of committing the crime), that conduct may show that (he/she) was aware of (his/her) guilt.  If you conclude that the defendant fled [or tried to flee], it is up to you to decide the meaning and importance of that conduct.  However, evidence that the defendant fled [or tried to flee] cannot prove guilt by itself."

4

avoid being observed or arrested.' " ' [Citation.] While physical flight to evade capture or escape from custody are two obvious examples of relevant conduct, the courts have long held ' "[a]*ny* conduct of a defendant subsequent to the commission of the crime tending to show consciousness of guilt is relevant and admissible . . . ." ' [Citation.] '[T]here need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference [of consciousness of guilt].' " (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 497–498, italics added by *Pettigrew* (*Pettigrew*).) " 'The evidentiary basis for the flight instruction requires sufficient, not uncontradicted, evidence.' " (*Id.* at p. 499.)

We review a claim of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) Reversal is required only if the instructional error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

In *Pettigrew*, the court held it was error to instruct on flight, pursuant to CALCRIM No. 372, where there was no evidence the defendant attempted to flee after the crime or escape from custody after his arrest. (*Pettigrew*, *supra*, 62 Cal.App.5th at p. 499.) After his arrest, however, the defendant twice tried to hang himself with his clothing in his jail cell. (*Id.* at p. 488.) Under the circumstances, the *Pettigrew* court determined it would have been appropriate for the trial court to draft an instruction based on the pattern instructions and relevant cases regarding the defendant's suicide attempts as evidence of consciousness of guilt. (*Id.* at pp. 499–500.)

Defendant contends that here, unlike in *Pettigrew*, the instruction is inapplicable because he did not attempt suicide post-arrest or take actions prior to his arrest that were designed to impede the investigation. He notes

he remained in the house, did not dispose of the gun or conceal evidence, allowed Gagnon's body to be discovered, and complied with police directives.

However, *Pettigrew* did not limit its holding to post-arrest suicide attempts. To the contrary, that court acknowledged " ' "[a]ny conduct of a defendant subsequent to the *commission of the crime* tending to show consciousness of guilt is relevant and admissible . . . ." ' " (*Pettigrew*, *supra*, 62 Cal.App.5th at p. 497, italics omitted, italics added.) Here, trial testimony indicated (1) defendant had injuries to the area under his chin, to his mouth, tongue, and the top of his forehead, and had a black eye; (2) the injuries to the area under defendant's chin and his forehead were consistent with a gunshot; and (3) black or swollen eyes are often a sign of being shot in the head. An officer responsible for crime scene processing also testified the evidence from the living room, including bullet hole in the window and blood spatter on the wall above the sofa, were consistent with defendant shooting himself. In addition, while the exact timing of defendant and Gagnon's interactions are uncertain, the record indicates Gagnon did not move from the spot where he was found after being shot. An officer also testified the weapon was found "stovepiped,"[2] which suggested the last shot could have been a suicide attempt.

Defendant contests the sufficiency of this evidence. For example, he contends a suicide attempt would have caused two black eyes rather than one, and the crime scene analyst had limited knowledge of blood spatter analysis and bullet trajectories. However, these arguments are appropriate for the jury to consider when assessing whether defendant attempted suicide. It does not undermine the appropriateness of the instruction, as " '[t]he

---

[2] "Stovepiping" refers to a firearm malfunction in which a bullet casing is stuck inside the gun's chamber.

6

evidentiary basis for the flight instruction requires sufficient, not uncontradicted, evidence.' " (*Pettigrew*, *supra*, 62 Cal.App.5th at p. 499.)

We thus conclude evidence from the crime scene, together with the injuries to defendant's face, could support a reasonable inference defendant attempted to commit suicide, reflecting consciousness of guilt. The trial court instructed the jury with a modified version of CALCRIM No. 372, that it could use such evidence for the limited purpose of deciding whether defendant had attempted to commit suicide and, if so, what importance should be attached to that attempt. It further instructed that evidence defendant made such plans could not prove guilt by itself. On this record, defendant has not shown the instruction was erroneous as a matter of law or unsupported by sufficient evidence. (Accord, *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102 ["facts giving rise to an inference of consciousness of guilt" do not need to be conclusively established; "there need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference"].)[3]

## B. Harmless Error

In any event, even if the trial court erred in instructing the jury with CALCRIM No. 372, we conclude the error was harmless. "The instruction did not assume that flight was established, but instead permitted the jury to

---

[3] Defendant also objects to much of the evidence being circumstantial. But he fails to cite any authority suggesting juries cannot rely on such evidence. To the contrary, such evidence is admissible and trial courts only must "instruct the jury regarding how to evaluate circumstantial evidence ' "... when the prosecution substantially relies on circumstantial evidence to prove guilt." ' " (*People v. Contreras* (2010) 184 Cal.App.4th 587, 591.) Here, the court did so by instructing the jury with CALCRIM Nos. 223 ("Direct and Circumstantial Evidence: Defined") and 224 ("Circumstantial Evidence: Sufficiency of Evidence").

make that factual determination and to decide what weight to accord it."
(*People v. Carter* (2005) 36 Cal.4th 1114, 1182–1183.)  Moreover, the evidence of Gagnon's injuries, defendant's presence at Gagnon's house during the time of the incident, and that the weapon belonged to defendant's stepfather all support the jury's verdict.  Accordingly, there is no reasonable probability the jury would have reached a more favorable result in the absence of the instruction.

## III.
## DISPOSITION

The judgment is affirmed.

MARGULIES, J.


WE CONCUR:


HUMES, P. J.


BOWEN, J.*


A163471
*People v. Paulson*

---

\* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

9